# Inman *against* Kutz.

In ejectment upon an equitable title, where the payment of money to the defendant is necessary, to enable the plaintiff to recover, a tender of the amount before suit brought, and bringing it into court on the trial, are sufficient; it need not be the same money, nor need it be brought in upon a rule of court.

In levies of real estate upon execution, more laxity of description is allowed than in deeds of conveyance: it is sufficient if the terms used show what was intended to be levied on; and where doubtful expressions are employed, the construction should be favorable to the plaintiff, to enable him to obtain payment of his debt from the property of his debtor.

When there is any evidence of a fact submitted to a jury, this court will not inquire into the propriety of the verdict; the remedy is in the court below on a motion for a new trial.

WRIT of error to the common pleas of *Luzerne* county.

This was an action of ejectment by Jacob Kutz against Caleb Inman, for the one-third part of a tract of land, containing 38 acres.   Richard Inman died seised of the land, leaving issue, eleven children, of whom Richard, Caleb, and John Inman were three.   In January, 1832, upon the petition of Israel Inman, the eldest son, a writ of partition and valuation was awarded, upon which the estate was divided into several parts, of which the land in question, 38 acres, was one, and called No. 2; valued at 70 dollars per acre.   Caleb Inman came into court upon the return of the writ, and took this No. 2 at the valuation, and entered into the recognizances required by law to the other heirs, and it was confirmed to him.

Then the plaintiff offered in evidence, an article of agreement, dated 7th Jan. 1833, between Caleb, Richard, and John Inman, produced by defendant on notice of the attorney of plaintiff to Caleb Inman, and in the possession of Caleb Inman, to which offer defendant's counsel objected; whereupon the court overruled the objection, and the defendant excepted.

Agreement then read in evidence as follows:—

Whereas, John Inman, and Richard Inman, have this day bargained and sold, transferred to me their interest, part and parcel of the real estate of Richard Inman, for the purpose of enabling the said John and Richard, in conjunction with myself, to take portion No. 2 in the division of our father's estate, for our joint benefit, and it is understood and agreed, that if the court permit me to take said portion at the appraisement, and demand recognizance to secure the payment of the due proportion of money to the other heirs and legal representatives, and also the widow's dower; then upon the said John and Richard, advancing at all times, their due proportions in money, as the court may order and direct me, then they shall be equally interested in said portion, number two.   That is, it is understood, that we hold as tenants in common, in equal proportions; the said Caleb holding the whole as security to cover his advances and liabilities, if any.—Witness my hand and seal this 7th January, 1833.

CALEB INMAN, [L. S.]

The plaintiff then gave in evidence a judgment against John Inman, upon which execution was issued, and the following levy made: "Levied on a tract or parcel of land, situate in Hanover Township, Luzerne county, and state of Pennsylvania, now in the hands and possession of Caleb Inman; and being the heirship of John Inman, in the real estate of Richard Inman." Upon a *venditioni exponas* the land was sold to the plaintiff for 20 dollars, and a deed made to him by the sheriff, describing the land as in the levy.   The recognizance entered into by Caleb Inman upon his taking the land at the valuation, was in the sum of 1600 dollars, conditioned for the payment of 876 dollars 35 cents, to the heirs of Richard Inman, after the death of the widow, the interest of which was to be paid to the widow during her life.   The plaintiff then proved the tender of 480 dollars to the defendant before suit brought, and the same sum was brought in on the trial.

The plaintiff then rested, and the defendant, to sustain the issue on his part, gives the following evidence:

January 10, 1833. Deed, Richard Inman and wife to Caleb Inman, being a release for consideration of one dollar, of their interest in real estate of Richard Inman, deceased.   Recorded January 12, 1840.

January 7, 1833.   Deed, John Inman to Caleb Inman, being a release for consideration of one dollar and other good considerations of interest of John Inman, in real estate of Richard Inman, deceased, acknowledged and recorded January 14, 1833.

January 7, 1833.   Deed, Richard and John Inman to Caleb Inman, for their interests in their father's estate.   Consideration of one dollar, and other good causes and considerations, them thereto moving.

Jonas Hartsell sworn—Proves the receipt of Richard Inman to Caleb Inman, of September 23, 1836.   This receipt then offered by

[Inman v. Kutz.]

defendant, to which offer plaintiff's counsel object. Court sustain the objection, and reject the receipt.

Samuel F. Headly sworn—Proves the signature of John Inman to receipt of April 4, 1834. Receipt then given in evidence.

"Hanover April 4, 1834.

"Received of Caleb Inman, one hundred dollars by me, it being in full of all demands against him for my heirship, or all my right, title, interest or claim in my father's estate, by me, according to agreement.    JOHN INMAN."

James Nesbitt sworn, says—I sold property of John Inman: was sheriff at the time. Received written notice [produces it] and made proclamation of it at the time of sale. Jacob Kutz was there—Inman also was present at sale, and gave notice, in addition that he owned John's interest in their father's estate, that he claimed the lands levied on by Kutz, and then selling. He said they might see the record.

Being cross-examined, he says—Inman said people might examine the record and see his title. He said that he had title—that they might look in the office and see his title. I do not recollect any thing said about receipts. Written notice dated January 3, 1835.

Defendant then rested, and plaintiff, as rebutting testimony, recalls David Scott, who says—I purchased part of the estate of Richard Inman, deceased. Caleb took three shares—his own, Richard's and John's. I was at Buttonwood in the spring, about the last of April or first of May, after I paid money to the state, which was in 1833, and saw Caleb on the flats. I went to him and spoke of purchasing. I offered him the amount of appraisement in sixty days, and would pay it into court. After conversing some time with him, Caleb said I will accept your offer. He said there is Richard and John whom I must consult before I make a bargain. He unharnessed his horses, and said he would never plough another furrow in the land. Heard nothing more of Caleb till the latter part of summer. · After August court, about the first of September, John, Richard and Caleb came to me, and agreed to every thing except paying the money into court. They wanted it paid to them. We could not agree. They all agreed they were equally interested in the property. That there was an agreement so that Caleb could take their share. One of them said it was on record—looked, but could not find it. They then said it was in O. Collins' hands.

Being cross-examined, he says—Jacob Ray was living on my Buttonwood farm when I had the conversation with Caleb on the flats—conversation with the three brothers in the same summer, and shortly before John left the country. I have no means of knowing the time except from the time of payment in patent. Land worth 6 dollars per acre a year. Went to converse with Caleb from what Ray told me. I was not to pay Caleb till the first of April. Caleb was willing to take the money, but said his brothers would not.

[Inman v. Kutz.]

The plaintiff then offered to prove by John R. Coudrey, that sometime before August court, the witness was at Berwick, and saw John Inman, who owed him money—that John Inman told him that he owned some landed property near this place, was about selling it to Judge Scott—that he was coming up at court to arrange the matter, and would then leave the pay for said Coudrey in the judge's hands. To which offer defendant's counsel objected. The court overruled the objection and admitted the evidence. Whereupon defendant's counsel excepted to the opinion of the court.

John R. Coudrey being sworn, says—I think just before August court I was at Berwick; saw a man they called John Inman. He told me he owned some landed property near this place, and he was about selling it to Judge Scott; he said he was coming up at court to have it arranged, and would then leave the pay in the judge's hands. Did not see John Inman after that; I was not down at court; down next week—went into prothonotary's office and found Judge Scott there.

Being cross-examined, says—My impression is I saw Judge Scott week after court; cannot fix time except from date of record—cannot swear to time.

Plaintiff then rested, and defendant recalled Samuel F. Headly, who said—From the entries in my books I think John Inman left Berwick for the west the morning of April 9, 1834; I am certain he left prior to the 10th. John Inman was here on April 4, 1834. John Inman either brought me up or took me down. I was at home on April 5, 1834. I went with John while here to the Flats. He had business to transact with his brother Caleb. I knew John Inman very well. He left a power of attorney with me to transact his business. This was executed April 5, 1834. I received money for John after he left. April 10, 1834, of George Muchler, a small payment received. May 10, 1834, received 10 dollars, 10 cents of John Snyder for John Inman. I have never seen John Inman since he left Berwick. He has not returned to my knowledge. I have received letters from him. His letters are dated Michigan city. May 9, 1834, I wrote to several debtors of John Inman to settle their accounts.

Being cross-examined, he says—I think I did not receive letters from John Inman till the winter after he left. John Inman came to me with a copy of a *scire facias*, and asked me, as counsel, whether it was a lien upon his real estate. Think he brought it to me in March 1834. I subsequently purchased a property of John Inman in Union.

There was much other parol evidence, respecting the indebtedness of John Inman, and the time and manner of his going away from the country, all for the purpose of showing the transaction between him and his brothers to be fraudulent.

And the counsel for the defendant prayed the court to charge the jury as follows:

　　x.—i

[Inman v. Kutz.]

1. That without a tender by the plaintiff of one-third of the valuation money of No. 2, before suit brought he cannot recover, and that in order to make a good tender, the party making it is bound to state distinctly the purpose for which it is made, and to inform the party to whom the tender is made, that the money tendered will be deposited in some person's hands from whom he may receive it at any time he chooses to call for it. And in order to avail himself of a tender, as made, it is the duty of the party pleading and proving it, to prove that the money brought into court is the same money which was tendered.

2. That there is not a legal tender and production of the same money into court proved in this case, and that the plaintiff cannot therefore recover.

3. That the sheriff's deed does not convey to the plaintiff any interest in No. 2, and as the plaintiff claims no title except under that deed, he cannot recover any interest in No. 2 in this action.

4. That the deeds of John Inman to Caleb Inman vest in Caleb all the estate and interest of John in No. 2, and that these deeds and the proceeding in the orphans' court vested the legal title to the whole of No. 2 in Caleb Inman, and that the receipt of April 4, 1834, was a legal and sufficient release of all John Inman's interest, under the agreement of Caleb, of January 7, 1833, whereby the whole estate in No. 2, legal and equitable, became well vested in Caleb Inman prior to June 28, 1834.

5. That fraud is to be proved by clear and satisfactory evidence, and that the jury must be satisfied, from clear and uncontradicted testimony, that the transaction between John and Caleb was fraudulent, before the jury will have any right to set aside the transaction.

6. That the deed of John Inman vested the legal title in Caleb Inman, and being on record at time of sheriff's sale, was notice to all purchasers of the transfer of title—that notice of the purchase of John's equity was not necessary—that the paper produced and signed by Caleb Inman is a declaration of trust and vested a mere equity in John Inman; that upon the declaration of trust being surrendered to Caleb, no further conveyances were necessary, and that the receipt, if believed by the jury to have been given before June 28, 1834, defeats John's equity and the equity of those claiming under John.

The court then charged the jury as follows:

*Jessup*, President.—"The plaintiff brought this suit to recover one-third part of a tract of land, containing 37 acres, 89 perches, formerly the estate of Richard Inman, deceased; and contained in a patent to him, dated November 25, 1834, among other lands.

"Caleb Inman, the defendant, is the son, and Jacob Kutz, the plaintiff, claims the rights of John Inman, another son of the said Richard Inman, deceased. Both parties claim under the same title, as derived from Richard Inman, the father. He died intestate, seised

of these lands, and leaving twelve children and grandchildren, as his legal representatives.

" In 1832, Israel Inman, one of the heirs, applied to the orphans' court for a partition of this estate, and proceedings were had thereon and the estate divided. On August 6, 1832, all the heirs being in court, the land now in controversy being division No. 2, containing 37 acres, 89 perches, valued at 70 dollars per acre, was appropriated to Caleb Inman, who accepted it at the appraisal, and on the 14th January following, entered into recognizance for the payment of the appraised value to the other heirs. The legal title to this land was thus vested in Caleb Inman. But previous to this, on the 7th day of January, John Inman and Richard Inman conveyed all their interest in their father's estate to Caleb Inman, and at the same time, John, Richard, and Caleb, entered into an agreement as follows: (here read the agreement.) The conveyance, these articles of agreement, and the vesting of the title in Caleb, by the proceedings in the orphans' court, are all to be taken together, and their effect was to vest in Caleb the legal title in trust as to one-third for the use and benefit of John. John was the real owner—Caleb was his trustee: and John, upon complying with the terms of the agreement, by paying Caleb for his liabilities and advancements, would be entitled to the possession and profits of one-third claimed in this election. But in order to entitle the plaintiff to recover, he must show himself legally vested with the interest of John in these lands, and that he has done all that John ought to have done under the agreement. John's interest in this land was subject to the lien of a judgment, and might be bound by the same; and for the purpose of showing that the interest of John is transferred to him, the plaintiff has shown the record in this court of a judgment obtained by him against John, and the usual proceedings thereon to a sale and a deed by the sheriff to him of " a tract or parcel of land, situate in the township of Hanover, in the county of Luzerne and state of Pennsylvania, now in the hands and possession of Caleb Inman, and being the heirship of John Inman, in the real estate of Richard Inman, deceased.

"These lands being in the possession of Caleb, John being an heir of Richard, these proceedings, with the deed of the sheriff, were sufficient to vest John's interests in the plaintiff, (the purchaser,) and this is in answer to the third point submitted by the defendant's counsel.

" In the situation in which John and Caleb were placed by the agreement of January 7, 1833, more than this was necessary in order to entitle the plaintiff to recover.

" By the terms of this agreement, Caleb was to retain possession of the whole until he was reimbursed for all his 'advances and liabilities, if any.' So that before the plaintiff can recover, he must prove that he has paid, or offered to pay to Caleb, the full amount

of these advancements and liabilities, and having so offered to pay and tendered it, must bring the money into court.

" The defendant's counsel, then, in their first point, ask the court to charge you, 'that without a tender by the plaintiff, of one-third of the valuation-money of No. 2, before suit brought, he cannot recover; and that in order to make a good tender, the party making it is bound to state distinctly the purpose for which it is made, and to inform the party to whom the tender is made, that the money tendered will be deposited in some person's hands, from whom he may receive it at any time he chooses to ask for it; and in order to avail himself of a tender so made, it is the duty of the party pleading and proving it, to prove that the money brought into court is the same money.' To this the court answer, that the tender in this case is unlike, in some respects, that of a debt due, where the tender must be pleaded, and in which case it must appear that the money has been kept, and the same brought into court, for here it is made for the purpose of removing the equitable claims of the trustee under the agreement. He having refused to receive it, and the same amount of money being now brought into court, the court think, in that respect, it was a sufficient tender, if the amount be such as to cover all that was due to Caleb for his advances and liabilities. The amount thus due him is that which plaintiff should have tendered. If, then, the jury believe from the evidence that the 480 dollars, the amount now brought into court, is sufficient to cover the advances and liabilities of Caleb, that it was offered to him on the 30th of June, by Kutz, in presence of Gildersleeve, that it was tendered for the purpose of paying these advances, and that Caleb was so informed at the time, it will be a sufficient tender under these articles. It was not necessary to inform him that the money would be deposited in any person's hands, from whom he could obtain it. If Caleb at any time chose to avail himself of the *offer of the* money, he could call upon the plaintiff for it; and if he refused to pay it, upon proper demand, the effect of the tender would be destroyed. The counsel of defendant further ask the court to charge you in their second point, ' that there is not a legal tender or production of the same money into court proved in this case, and that the plaintiff cannot therefore recover.'

" The court in answering the preceding point, have stated the law in the case, and it will be for the jury to decide upon the facts as given in evidence.

" If from the evidence the jury believe the sum, thus said to have been tendered, was not sufficient to cover the advance and liabilities, the plaintiff cannot recover.

" But the defendant contends further, that if the title of John were legally vested in plaintiff by the sheriff's sale, and plaintiff had fully complied with the conditions of the agreement, and done every thing necessary under it for his recovery, still, that before the

rendition of the plaintiff's judgment all the interest of John had been vested in defendant, and in his fourth and sixth points asks the court to charge you, " that the deeds from John Inman to Caleb Inman vest in Caleb all the estate and interest of John in No. 2, and that these deeds and the proceedings in the orphans' court, vested the legal title to the whole of No. 2 in Caleb Inman, and that the receipt of the 4th of April 1834, was a legal and sufficient release of all John Inman's interest under the agreement of Caleb of 7th January 1833, whereby the whole estate of No. 2, legal or equitable became well vested in Caleb Inman prior to the 28th June 1834, and that the deed of John Inman vested the legal title in Caleb Inman, and being on record at the time of the sheriff's sale, was notice to all purchasers, of the transfer of title, that notice of the purchase of John's equity was not necessary; that the paper produced and signed by Caleb Inman is a declaration of trust, and vested a mere equity in John Inman, that upon the declaration of trust being surrendered to Caleb no further conveyances were necessary, and that the receipt, if believed by the jury to have been given before the 28th of June 1834, defeats John's equity and the equity of those claiming under John.'

" To this the court answer, that as between John and Caleb, the law as stated in these points is correct. The effect of the deed, agreement and other proceedings has been before stated: Caleb held the legal title—the articles of agreement showed upon what terms—the receipt of the 4th April 1834, was sufficient with the surrender to Caleb by John of the agreement of the 7th January 1833, to vest in Caleb all the equities of John. The receipt is a *memorandum* in writing signed by the party selling an equitable interest, to the holder of the legal title then being in possession and having the title papers duly upon record. This was sufficient to pass the interest of John to Caleb. The plaintiff had notice of the title of Caleb by the possession and the record of the deed, and as these proceedings as between John and Caleb were binding and valid, they raise the question of whether these transactions were *bona fide* or fraudulent. If they are fraudulent as against the plaintiff, they will be void. The question of fraud is one for the jury to decide under all the evidence in the cause. Upon this part of the case the defendant's counsel have requested the court to charge you, 'that fraud is to be proved by clear and satisfactory evidence, and that the jury must be satisfied from clear and uncontradicted testimony that the transaction between John and Caleb was fraudulent, before the jury will have a right to set aside that transaction.'

" It is true that fraud is always to be proved and never to be presumed. And before a transaction, apparently fair and honest, can be set aside for fraud, the jury must be satisfied, *by the evidence* in the case, that it was fraudulent. There is no difference as to the

x.—i*

[Inman v. Kutz.]

kind or amount of evidence which is necessary to prove fraud, and that required to establish any other disputed fact in the case.

" The jury then in deciding whether these transactions between John and Caleb transferring the property to Caleb were fraudulent, will take into consideration *all* the evidence, all the circumstances of the parties as given in evidence, and from a full and impartial examination of them, will say whether they are satisfied of the honesty of the transfer, or of its having been made dishonestly and with intent to defraud creditors.

" In deciding this part of the case, the relationship of the parties, pressing indebtedness of one of them, inadequacy of price, and the absconding of John, are some of the circumstances of the case deserving the consideration of the jury."

Errors assigned: —

1. The court erred in admitting the evidence mentioned in the first bill of exceptions.

2. The court erred in admitting the evidence mentioned in the second bill of exceptions.

3. The court erred in rejecting the evidence mentioned in the third bill of exceptions.

4. The court erred in their answer to the first and second points made by the defendant's counsel.

5. The court erred in their answer to the third point submitted.

6. The court erred in raising the question of fraud in their answer to the fourth and sixth points made by defendant's counsel and submitting it to the jury, there not being evidence to connect Caleb Inman with any such question.

7. The court erred in charging in answer to the fourth and sixth points, that the articles of agreement and the deed between John and Caleb, the receipt of the 4th April 1834, and the surrender of the articles of agreement by John to Caleb, raised the question, whether these transactions were *bona fide* or fraudulent.

8. The court erred in instructing the jury that in deciding whether these transactions between John and Caleb were fraudulent or not, the inadequacy of price, and the absconding of John, were circumstances deserving the consideration of the jury.

9. The court erred in referring to the jury questions not raised by the evidence in the case.

*M'Clintock* and *Woodward*, for plaintiff in error, on the subject of the insufficiency of the tender, cited 6 *Watts* 165. As to insufficiency of the description, *Rot. Dig.* 295; 1 *Rawle* 231. And on the question of fraud, 3 *Penns. Rep.* 160.

*Wright*, for defendant in error, on the subject of tender, cited 1 *Whart. Selw.* 153; 1 *Peters* 24; 3 *Har. Dig.* 2069. The declarations of John were evidence because he partook of the fraud. 4 *Watts* 359; 3 *Watts* 232; 3 *Serg. & Rawle* 9. The sheriff's

deed described the land sufficiently, 8 *Johns.* 393; 7 *Johns.* 222; 16 *Johns.* 172; 4 *Com. Dig.* 286; 13 *Johns.* 97. 551.

The opinion of the court was delivered by

Sergeant, J.—The defendant below, plaintiff in error, has as-signed several errors in respect to the evidence on the trial, and in the charge of the court.

1. The first bill of exceptions is to the admission of the agree-ment, dated the 7th January 1833, by which the defendant, in con-sideration of a transfer to him from his two brothers, John and Richard, of their interest in their father's estate, agreed, that the defendant should elect to take the tract No. 2, now in question, and hold it as the common estate of the three parties, subject to certain charges to which it might become liable. The plaintiff in this ejectment claimed the one-third thus acquired by John Inman, as purchaser of it at sheriff's sale. The agreement was material, and it would seem indispensable to the plaintiff's recovery. No reason has been given why the evidence was not admissible.

2. The evidence of Coudrey, stating declarations made by John Inman, that he had an interest in the property, was admitted by the court, after objection by the defendant. The defendant alleges that the declarations of John, in his absence, were not evidence against him. From want of precision in the offer of this testimony, and in the testimony itself, a doubt has been suggested, as to the time when these declarations occurred. If it was in the year 1833, as that was previous to the receipt by John to Caleb, of the 4th April 1834, they would merely go to show that John still claimed an interest in the tract, and would be of little importance to either side. But it seems to be considered by the defendant as having been used by the plaintiff as a conversation occurring in the year 1834, and as evincing the receipt to have been covinous and fraudulent. Taking the evidence, however, as we have it on the record, it seems not properly applicable to the year 1834. The time mentioned by Judge Scott, is the year 1833, and to that time the witness referred. Miller's testimony, when he was subsequently examined, tends to the same conclusion.

3. The defendant offered the receipt of the other brother, Richard Inman, for 227 dollars, dated the 23d September 1836. We think this was properly rejected, being long after the transaction in dis-pute between the parties, and *res inter alios acta.* Besides, a mere receipt, though the handwriting of the subscriber be proved, is not the best evidence of payment, and, therefore, not competent evidence to prove it.

The remaining errors assigned are to the answers of the court below, to certain points proposed by the defendant.

1 and 2. The contract between Caleb and John was, that John was to be interested in one-third of the tract, he paying his pro-portion of the recognizance to be given by Caleb to secure the pay-

:ments to the other heirs and representatives, and the dower of the widow. The amount thus due by John, was estimated by the plaintiff at 480 dollars, and he made a tender of this sum to the defendant before this suit was instituted, and brought the amount into court on the trial, repeating the tender there. This was all he was bound to do, when prosecuting an ejectment to enforce his title. He was not obliged to obtain a rule of court, and pay the money into court, as a defendant must do who pleads a tender to an action against him for the recovery of money. Much less was he bound to deposit the money tendered and refused, in the hands of a third person. The answer of the court presents the legal principle regulating a case like the present.

3. The levy was on "a tract or parcel of land, situate in the township of Hanover, Luzerne county, and state of Pennsylvania, now in the hands and possession of Caleb Inman, and being the heirship of John Inman, in the estate of Richard Inman." The sheriff's deed corresponds with the levy. The site of the land, though not certain, may have been made so, by the proof given of its being in the possession of Caleb, as well as by reference to it as the heirship of John. The levy on the tract generally, would embrace whatever interest John might hold in it, unless there were something else in the levy restricting it to a particular part or share of the land. As in M'Cormick *v.* Harvey, 9 *Watts* 482, decided at Harrisburg last term, where a levy was on a tract, being the moiety of the defendant therein: it was held, that the generality of the levy, should be restrained by the express words following, to a moiety only. Then the question arises here, whether the words, " *being the heirship* of John Inman in the estate of Richard Inman," do qualify the levy. For the actual share which John inherited from his father Richard, was but one-eleventh, there being eleven children or their representatives. This share John released to Caleb, by deed of the 7th January 1833, contracting with Caleb by an agreement of the same date, that he should be tenant in common with Caleb and Richard, of tract No. 2, if Caleb elected to take it. So that strictly speaking, it was a purchase of one-third of tract No. 2, by John. Still it is a right which originated in his interest in that tract as heir, and is a sort of commutation for it. In levies more laxity of description is allowed than in deeds and conveyances, because the defendant's title is not always accessible to the plaintiff, but may depend, as here, on secret documents and articles, the production of which can only be enforced on trial of a suit. In Palmer's case, 4 *Coke* 74, it is laid down that if the sheriff sell all the interest that the defendant has in the land, it is good enough, notwithstanding a misrecital; for by common intendment the sheriff cannot have precise knowledge. We think it is sufficient if the terms used show what was intended to be levied on; and where doubtful expressions are employed, the construction should be favourable to the plaintiff, to enable him to obtain pay-

ment of his debt from the property of his debtor, rather than that he should lose it. There is, therefore, no error in this answer of the court.

Sixth, seventh, eighth and ninth errors. The remaining errors relate to the merits of the case. The plaintiff alleged the release by John to Caleb, to have been a fraudulent act—not merely a legal fraud, such as a voluntary conveyance has, in some cases, been considered as against creditors—but a contrivance between the brothers to defeat the creditors of John. This was matter of fact for the jury on the evidence, and was so left to them by the court. If there was any evidence at all on the subject, it is not for us, sitting as a court of error, to say whether it was sufficient. If there had been no evidence at all, our duty would be to reverse the judgment. But we cannot say that was the case here: on the contrary, there were circumstances in the case from which the jury might infer fraud, and if the whole case, taken together, was not sufficient for that purpose, the remedy was by application to the court below for a new trial.

Judgment affirmed.